926 P.2d 599

STATE of Hawai'i, Plaintiff–Appellee,

v.

Walter L. BUCH, Defendant–Appellant.

No. 18972.

Supreme Court of Hawai'i.

Oct. 9, 1996.

Brian Custer, on the briefs, Honolulu, for defendant-appellant.

James M. Anderson, on the briefs, Deputy Prosecuting Attorney, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Defendant-appellant Walter L. Buch appeals from his conviction, after a jury trial, for sexual assault in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 707–732(1)(b) (1993).[1]  Buch alleges as error the circuit court's: (1) refusal to instruct the jury on the "lesser included offense" of sexual assault in the fourth degree; (2) denial of his motion to suppress statements he claims were involuntarily given; and (3) denial of his motion for a mental examination of the complaining witness.  For the reasons stated below, we affirm.

## I.  BACKGROUND

At trial, the complaining witness, who was thirteen years old at the time of the incident in question, testified that, on the afternoon of March 11, 1992, he had finished lifting weights at the Central YMCA and was taking a shower.  Buch, whom the complaining witness had never seen before, entered the shower room and initiated a conversation.  Buch kept saying how much he liked kids and told the complaining witness that he had a nice smile.  When they had finished showering, Buch took the complaining witness to the front desk to show him how to check out equipment.  While he was talking to the complaining witness at the front desk, Buch kept placing his hand on the complaining

---

1. HRS § 707–732(1)(b) provides in pertinent part that "[a] person commits the offense of sexual assault in the third degree if .... [t]he person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person."

witness's back and leading him away from the desk.

Buch then took the complaining witness upstairs to his room on the third floor so that he could give the complaining witness his telephone number. Once in Buch's room, Buch opened his wallet, showed the complaining witness a badge, and told the complaining witness that he was a paramedic for the city and county. Buch then told the complaining witness that he had some cream that would help his acne. He asked the complaining witness if he had money, gave him five dollars, and offered the complaining witness cigarettes and beer.

Buch began to touch the complaining witness under his arms while the complaining witness sat on the bed and asked if it hurt. Buch then worked down to the complaining witness's hips and, after taking off complaining witness's shirt, pressed his lower abdomen. The complaining witness did not remember how his pants got off, but Buch then was holding the complaining witness's penis and testicles, under his underwear, and asked if it hurt.

When Buch turned his back, the complaining witness put his clothes back on. Buch said, "Oh, yeah, put on your clothes." Buch then put cream on the complaining witness's face and told him that it was "real powerful" and that he should come back twice a week for more cream. The complaining witness asked Buch if Buch would like to meet his mother, and Buch said, "Oh, no. Don't tell nobody." At that point, the complaining witness suspected that something was wrong. Buch told the complaining witness to give him a hug and then walked him downstairs. Buch and the complaining witness were in Buch's room for approximately fifteen minutes, between 6:15 and 6:30 p.m. On the way out, they saw Carey Won, the teen programs director for the YMCA, who told Buch that he was not supposed to have guests upstairs.

The complaining witness then took the bus to his mother's work place. When asked why he was late, the complaining witness told his mother what had happened, and his mother called the police. Later the same evening, March 11, 1992, the complaining witness identified Buch at a field show-up in front of the YMCA, and Buch was arrested. The following day, Buch gave a tape-recorded statement to Honolulu Police Department (HPD) Detective Timothy Mimaki at the Honolulu Police Station. Buch signed an HPD form 81, indicating that he had been informed of his constitutional rights and waived the presence of an attorney. In his tape-recorded statement, Buch did not admit to any offense.

Buch was indicted on December 14, 1993. The single-count indictment alleged that:

> On or about the 11th day of March, 1992, in the City and County of Honolulu, State of Hawaii, Walter L. Buch did knowingly subject to sexual contact, [the complaining witness], who is less than fourteen years old and not his spouse, by placing his hand on [the complaining witness's] penis, thereby committing the offense of Sexual Assault in the Third Degree, in violation of Section 707–732(1)(b) of the Hawaii Revised Statutes.

On October 11, 1994, Buch filed a motion for mental examination of the complaining witness, arguing that

> defendant is raising the issue of the effect of the victim's mental and/or emotional condition upon his ... credibility based on his claim that the victim is homosexual and that the victim's accusation was part of an attempt to gain money from the defendant. In addition, the defendant is undergoing a psychosexual evaluation as part of his examination for fitness/responsibility.

The prosecution argued that the victim's sexual tendencies and desire for money, even if true, did not present sufficient and compelling reasons for a court-ordered mental examination. On December 1, 1994, following a November 14, 1994 hearing on the motion, the court issued its written order denying Buch's motion. The court concluded that "the allegation that the complaining witness is a homosexual or that he wanted money is neither [a] sufficient [n]or compelling ground for such an examination. The issue of credibility is [an] insufficient basis to have the complaining witness undergo a mental examination; [credibility] is for the jury to decide."

On October 21, 1994, Buch filed a motion to suppress the statement he made to the police the day after his arrest. He asserted that his statements were involuntary and should be suppressed because: (1) no one read Buch his *Miranda* rights when he was arrested, and, (2) before the tape-recorded interview, Detective Mimaki told Buch that, if he did not talk, Mimaki would make sure that a high bail would be set and that Buch would lose his paramedic license. Buch contended that:

> The effect of these pre-questioning statements on the defendant were to make the defendant: (1) suffer psychological trauma, (2) worry regarding his paramedic career, (3) be embarrassed by the entire situation, (4) worry about making the front-page of the local newspapers as he had in the past, (5) experience exacerbated symptoms of stress and hypertension for which he was already collecting worker's comp[ensation] payments, and (6) be reminded of various unpleasant law-enforcement related memories of events which [had] occurred 30 years ago.

The court orally denied the motion to suppress following the November 30, 1994 hearing. The court's "Findings of Fact [ (FOF) ], Conclusions of Law [ (COL) ] and Order Denying Defendant's Motion to Suppress Statements" was filed on December 8, 1994. The court found, *inter alia*, that "Defendant was cooperative and willing to engage in the interrogation process[,]" FOF 6, and that "Defendant understood his Constitutional Rights and Defendant did waive his rights voluntarily, knowingly, and intelligently." FOF 18. The court concluded that "[i]n this case, Defendant voluntarily gave a statement to Detective Mimaki." COL 6.

The evidentiary phase of Buch's trial began on December 20, 1994 and lasted only one day. In addition to the testimony of the complaining witness, the prosecution's evidence included testimony from the complaining witness's mother, the investigating HPD officers, and Won. At the close of the prosecution's case, Buch moved for a judgment of acquittal, asserting that the prosecution had not proven beyond a reasonable doubt that Buch knew that the complaining witness was less than fourteen years old. The court denied the motion, ruling that the legislative history of the precursor statutes to the charged offense demonstrated that the legislature did not intend to require actual knowledge of the age of the victim, and, therefore, the prosecution was not required to prove that Buch knew that the complaining witness was less than fourteen years old.

Buch was the sole defense witness. With respect to the events of March 11, 1992, Buch testified that he was showering at the YMCA when the complaining witness came in to take a shower. Buch testified that

> the immediate thing that came to my mind was how come teenagers at the YMCA don't have their own shower room because all the years that I worked at Saudi Arabia there's shower rooms and bathrooms separately for the men and the boys as well as for the wom[e]n and for the girls. And then I had this idea maybe I should donate some money to the YMCA and match them so I can build a separate shower for the teenagers at the YMCA.

Buch stated that the complaining witness appeared to be between fourteen and sixteen years old. He said that the complaining witness initiated a conversation with him when the two were drying off. He testified that he could not remember exactly what the complaining witness said "because at the time I was thinking how come this teenager's—this baby is showering with all the guys and especially knowing about the YMCA, you know." Buch said that, when the complaining witness asked him where the basketball court was, rather than tell him, he took the complaining witness to Won's office, and Buch was "kind of upset with [Won] that time because I just made that announcement, $5,000 donation announcement, plus—plus donating that $400 cash to the teen youth program in February." Buch then took the complaining witness to show him where the basketball and racquetball courts were located.

Buch testified that, because the complaining witness said that he was late to meet his mother, Buch said "[w]hy don't you come up to my room and I'll give you some money so you can catch a taxi[.]" The complaining

witness appeared to Buch to be anxious, but went with Buch to his room. Buch testified that he did not assault the complaining witness, but, rather, when Buch was taking money out of his wallet to give to him, "[the complaining witness] touched me down in the genetoria [sic] area. And I told [the complaining witness], 'Listen, I don't appreciate this. Take the money and leave right now. I'll go with you—I'll walk you back downstairs.'" Buch denied offering the complaining witness cigarettes or beer, putting acne cream on his face, touching him, or hugging him.

Buch requested a jury instruction on the lesser included offense of sexual assault in the fourth degree.[2] The court refused to give the instruction, reasoning that,

> if there is any evidence or if on the evidence there would be a question about the date of birth, then the giving of sexual assault in the fourth degree would be appropriate where sex assault in the third degree is charged under section (1)(b) as it is here. Therefore, I think in certain circumstances where that issue is in question at all, even a scintilla of evidence to question it or to be concerned about would make this an included offense.
>
> But I also agree with [the prosecutor], since state of mind this court has ruled is not a burden of the state as to the age of the defendant, that it would not be appropriate to give the included offense where there is no basis in the evidence for doing so on the date of birth or the age of the person as opposed to the knowledge of the defendant about the person's age.

The court indicated, however, that the ruling might have to be reconsidered and the instruction on sexual assault in the fourth degree given if the defense, in closing argument, planned to argue that the prosecution had not proven beyond a reasonable doubt that the complaining witness was less than fourteen years old on March 11, 1992. The following day, before closing arguments, the court stated:

> The court needs to create a record regarding that defense's proposed supplemental instruction which would purport to give an included offense under 707–733(1)(a). And the court rules as follows: Notwithstanding the argument made yesterday, ... 707–733(1)(a)[,] this court finds[,] is not an included offense of 707–732(1)(b) because under (1)(a) the state would have to prove an additional element of compulsion which is not required under 707–732(1)(b), thus taking it out under the law from the definitional section of included offenses and, therefore, refuses the instruction over the objection of the defense.

The jury found Buch guilty as charged, and he timely appealed from the judgment, conviction, and sentence.

## II. DISCUSSION

### A. The Trial Court Properly Refused to Instruct the Jury on Sexual Assault in the Fourth Degree.

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Robinson, 82 Hawai'i 304, 310, 922 P.2d 358, 364 (1996), (citing State v. Knight, 80 Hawai'i 318, 324, 909 P.2d 1133, 1139 (1996)). "The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." HRS § 701–109(5) (1993).

Buch argues that,

> [i]n not giving defendant's lesser included jury instruction[,] the court stated that sexual assault in the fourth degree is not a lesser included offense with respect to sexual assault in the third degree because to so rule would require that the state prove [an] extra element; i.e., that of compulsion. This conclusion of law was erroneous be-

---

**2.** HRS § 707–733(1)(a) (1993) provides in pertinent part that "[a] person commits the offense of sexual assault in the fourth degree if ... [t]he person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion[.]"

cause it misapplied the *State v. Kupau* [63 Haw. 1, 620 P.2d 250 (1980) ] test. That is, there was sufficient evidence adduced at trial that if believed could have led the jury to acquit defendant of the sexual assault in the third degree charge and yet convict him of the lesser included offense of sexual assault in the fourth degree.

Buch contends that his testimony that the complaining witness appeared to be between the ages of fourteen and sixteen at the time of the assault provides a rational basis for acquitting Buch of sexual assault in the third degree and convicting him, instead, of sexual assault in the fourth degree.

■ Buch apparently fails to recognize that he is not entitled to have the jury instructed on an offense other than the charged offense unless (1) that offense is a lesser included offense of the charged offense as defined in HRS § 701–109(4) (1993), *and* (2) the instruction is warranted by the evidence. In this case neither condition is satisfied.

1. **Sexual assault in the fourth degree is not a lesser included offense of sexual assault in the third degree as charged in this case.**

An offense is included in the charged offense when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged[,]" HRS § 701–109(4)(a), or "[i]t differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission." HRS § 701–109(4)(c).[3]

■ Buch was charged with sexual assault in the third degree, in violation of HRS § 707–732(1)(b). To establish the charged offense, the prosecution was required to prove beyond a reasonable doubt that the defendant: (1) knowingly (2) caused sexual contact (3) with a person less than fourteen

years of age. HRS § 707–732(1)(b). Sexual assault in the fourth degree, as defined by HRS § 707–733(1)(a), requires proof that the defendant: (1) knowingly (2) caused sexual contact (3) by compulsion. Because sexual assault in the fourth degree requires proof of an additional fact—compulsion—it may not be established by proof of the same or less than all the facts required to establish sexual assault in the third degree in violation of HRS 707–732(1)(b). Therefore, it is not an included offense as defined by HRS § 701–109(4)(a).

■ Nor is sexual assault in the fourth degree included in sexual assault in the third degree, as charged in this case, under HRS § 701–109(4)(c). The injury proscribed by HRS § 707–733(1)(a) is not less serious than the injury proscribed by HRS § 707–732(1)(b); both offenses require proof of the same injury—sexual contact—to establish their commission. Moreover, the state of mind required to establish sexual assault in the fourth degree—knowingly—does not indicate a lesser degree of culpability than that required to establish sexual assault in the third degree under HRS § 707–732(1)(b)—knowingly with respect to the result and, as discussed *infra*, strict liability with respect to the attendant circumstance of the victim's age.

Therefore, we hold that sexual assault in the fourth degree is not included in the charged offense as defined by HRS § 701–109(4).

2. **HRS § 707–732(1)(b) does not require proof that the defendant have knowledge of the attendant circumstance of the victim's age, so the fact that Buch may have been unaware that the complaining witness was thirteen years old is not a rational basis for acquitting him of sexual assault in the third degree.**

■ Even assuming, *arguendo*, that sexual assault in the fourth degree is a lesser included offense of the charged offense, Buch was not entitled to a lesser included offense

---

**3.** HRS § 701–109(4)(b), which provides that "an attempt to commit the charged offense or an offense included therein" is a lesser included offense of the charged offense, is not applicable on the facts of this case.

instruction because there was no rational basis in the evidence for a verdict acquitting him of sexual assault in the third degree and convicting him of sexual assault in the fourth degree. Buch contends that, "if the jury believed defendant's testimony that the complaining witness appeared to be between the ages of 14 and 16 at the time of the alleged sexual assault, it could have acquitted defendant of the sexual assault in the third degree charge." In a ruling unchallenged by Buch, however, the trial court found that Buch's knowledge of the attendant circumstance that the complaining witness was less than fourteen years of age was not an element of the charged offense.

Therefore, the court expressly ruled that Buch was not entitled to a judgment of acquittal based on the prosecution's failure to prove beyond a reasonable doubt that Buch acted knowingly with respect to the complaining witness's age. In other words, even if the jury believed that Buch thought the complaining witness was between fourteen and sixteen years old, if the trial court's interpretation of HRS § 707–732(1)(b) is correct, Buch's belief does not provide a rational basis for a verdict acquitting Buch of sexual assault in the third degree.

This court has not had occasion to rule on this issue in the context of the Hawai'i Penal Code. Prior to the adoption of the Penal Code, the court considered whether a mistake of fact regarding the victim's age provided a defense to a charge of statutory rape. In *State v. Silva*, 53 Haw. 232, 491 P.2d 1216 (1971), the defendant was charged with violating HRS § 768–21, which provided that, "[w]hoever is convicted of having sexual or carnal intercourse with any female under the age of sixteen years, not his lawful wife, shall be imprisoned at hard labor not more than ten years." HRS § 768–21 (1968). The trial court refused to give an instruction requested by the defendant, raising the defense of reasonable mistake of fact as to the age of the victim. *Id.* at 232, 491 P.2d at 1216. On appeal, the defendant argued that "the better rule of law is to allow a defense of a mistake of fact concerning the age of the prosecutrix." *Id.*

This court disagreed and, relying on the reasoning in *Territory v. Delos Santos*, 42 Haw. 102, 104–108 (1957), explained that:

> The offense here is of that class which, by reason of an unbroken line of judicial holdings, it can be said that the statute denounces the mere doing of the act as criminal, regardless of whether the perpetrator had a bad mind, the generalized intent to engage in a course of criminal conduct. Second degree rape is a recognized judicial exception to the general rule that a mistake of fact is a defense to the charge[.]

*Id.* at 233, 491 P.2d at 1217 (citation omitted). The court stated that, "[i]f mistake of fact is to be the standard of permissive conduct, the legislature is the appropriate forum to indulge in that decision." *Id.* (citation omitted).

*Silva* was decided before the enactment of the Hawai'i Penal Code, 1972 Haw.Sess.L. Act 9, § 2, at 142. The Hawai'i Penal Code was "originally drafted by the Committee on Penal Law Revision of the Judicial Council of Hawaii and [is] a derivative of the Model Penal Code as recommended by the American Law Institute[.]" Conf.Comm.Rep. No. 1, in 1972 House Journal, at 1035. Its purpose was to "effect the first complete reorganization of the criminal law of the State of Hawaii by a redefinition of criminal offenses[.]" *Id.* As noted in the dissenting opinion in *Silva*, the proposed draft of the Hawai'i Penal Code would change the result in *Silva*, by requiring knowledge of the attendant circumstance of the victim's age:

> Nor does the view [expressed by the majority opinion] prevail with the Judicial Council of Hawaii, under whose auspices the proposed draft of the Hawaii Penal Code was propounded. Hawaii Penal Code § 731 (Proposed Draft, 1970) provides in pertinent part:
>
> (1) A male commits the offense of rape in the second degree if:
>
> . . . . .
>
> (b) he intentionally engages in sexual intercourse with a female whom he *knows* is less than 12 years old. (Emphasis added).

The Commentary on §§ 730–732 (footnotes omitted) includes the following:

> The Code's provisions dealing with a victim under 12 years old is in accord with the lower limit of the age of effective consent under previous Hawaii law. Formerly, in Hawaii, as in many jurisdictions which have not undergone recent revisions of their criminal laws, the actor was held strictly liable with respect to the victim's age. Such strict liability runs contrary to the general principles of penal liability set forth in Chapter 2, which require a culpable state of mind with respect to each element of an offense.... ·

*Silva*, 53 Haw. at 238 n. 5, 491 P.2d at 1219 n. 5 (Levinson, J., dissenting).

Like section 707–731(1)(b) of the 1970 Proposed Draft of the Hawai'i Penal Code, the "sex offenses" proscribed by sections 707–730(1)(b) (rape in the first degree), 707–733(1)(b) (sodomy in the first degree), 707–734(1)(b) (sodomy in the second degree), and 707–736(1)(b) (sexual abuse in the first degree) each included, as an element of the offense, a victim "whom [the defendant] knows is less than 12 years old." *See* Stand. Comm.Rep. No. 599, in 1971 Senate Journal, at 1067, 1077.

As the commentary to the Proposed Draft quoted by Justice Levinson explained, under previous Hawai'i law, the defendant had been held strictly liable with respect to the age of the victim, which was contrary to the general principles of criminal liability set forth in Chapter 2 of the proposed code. Chapter 2 of Act 9 includes among the "General Principles of Penal Liability":

> **Sec. 207—Specified state of mind applies to all elements.**
>
> When the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears.

1972 Haw.Sess.L. Act 9, § 207, at 44, now HRS § 702–207 (1993). The commentary to HRS § 702–207 makes clear that

> [t]he phrase "unless a contrary purpose plainly appears" is intended to allow the courts to avoid an improper result when the language of a statute fails to indicate that the specified state of mind applies to less than all elements *and legislative history indicates that this was intended.*

(Emphasis added.)

Buch was charged with sexual assault in the third degree, in violation of HRS § 707–732(1)(b), which was enacted in 1986 when the Legislature eliminated rape and sodomy as offenses and incorporated all of the sexual offenses into five degrees of sexual assault. *See* 1986 Haw.Sess.L. Act 314, § 57 at 617–18; Conf.Comm.Rep. No. 51–86, in 1986 House Journal, at 937, 938. As originally enacted in the Penal Code, HRS § 707–736(1)(b) provided that "[a] person commits the offense of sexual abuse in the first degree if ... [h]e [or she] intentionally has sexual contact with another person who is less than fourteen years old or causes such a person to have sexual contact with him [or her]." HRS § 707–736(1)(b) (1976). Sexual abuse in the first degree, in violation of HRS § 707–736(1)(b), like sexual assault in the third degree, in violation of HRS § 707–732(1)(b) (Supp.1992) was a class C felony. The only difference between HRS § 707–736(1)(b) and the charged offense is that, in the course of the 1986 revisions, the state of mind was reduced from "*intentionally* has sexual contact" to "*knowingly* subjects to sexual contact."

Buch, in support of his motion for judgment of acquittal, relied on HRS § 702–207 to argue that the state of mind specified in HRS § 707–732(1)(b)—knowingly—applied to the attendant circumstance of the victim's age. As the trial court pointed out, however, the legislature amended the language of the Proposed Draft to eliminate the requirement of knowledge of the victim's age in those sex offenses where the victim's age was an attendant circumstance. The relevant Conference Committee Report states as follows:

> **Sections 730 through 740: Sexual offenses**
>
> Your Committee has agreed to amend Section[s] 730(1)(b), 731(1)(b), 733(1)(b), 734(1)(b), 736(1)(b), 737(1)(b) and 738(1) to

eliminate the requirement of actual knowledge and to increase the age of consent from 12 to 14 years.... Your Committee has agreed to amend Section 737(1)(b) to increase the age provision from fourteen to sixteen years. Similarly, the Committee has agreed to eliminate the requirement of actual knowledge, stated in that section.

Your Committee has agreed to amend Section 739 by deleting subsection (2) thereof because of prior amendment of Sections 730, 731, 736 and 737 to eliminate the knowledge requirement.

Conf.Comm.Rep. No. 1, in 1972 House Journal, at 1038; *see also* Conf.Comm.Rep. No. 2 (Majority), in 1972 House Journal, at 1044; Stand.Comm.Rep. No. 227, in 1971 House Journal, at 788; Stand.Comm.Rep. No. 599, in 1971 Senate Journal, at 1074; Supplemental Commentary to HRS §§ 707–730 to 732 (1976); Supplemental Commentary to HRS §§ 707–733 to 735 (1976); Supplemental Commentary to HRS §§ 707–736 to 737 (1976) ("As in the case of rape and sodomy, when the Legislature adopted the Code in 1972, it eliminated the requirement of actual knowledge and increased the age of consent from 12 to 14 years for sexual abuse in the first degree.").

The legislative history unequivocally indicates that, where the age of the victim is an element of a sexual offense, the specified state of mind is not intended to apply to that element. We therefore hold that a defendant

is strictly liable with respect to the attendant circumstance of the victim's age in a sexual assault; consequently, Buch's testimony that the victim appeared to be between fourteen and sixteen years of age is not a rational basis in the evidence for a verdict acquitting him of sexual assault in the third degree and convicting him of sexual assault in the fourth degree.

This case is distinguishable from, and not irreconcilable with, *In the Interest of John Doe, Born on September 5, 1977,* 81 Hawai'i 447, 918 P.2d 254 (1996). In that case, the Intermediate Court of Appeals (ICA) held that "a defendant could not be found guilty of the offense [of second degree sexual assault of a mentally defective person, in violation of HRS § 707–731(1)(b) (1993)[4]] unless the State proved beyond a reasonable doubt that the complaining witness was mentally defective and that the defendant was aware that the complaining witness was mentally defective." *Id.* at 449, 918 P.2d at 256. The ICA reasoned that, pursuant to HRS § 702–207 (1993), the state of mind specified by HRS § 707–731(1)(b)—knowing—applied to the attendant circumstance of the victim's mental defect because "[t]he legislative history of the statute does not indicate that the legislature intended a different state of mind to apply to any of the specific elements of the offense." *Id.* at 454, 918 P.2d at 261 (footnote omitted).[5] The legislative history of HRS § 707–732(1)(b), by contrast, leaves no doubt that the legislature did not intend the

---

**4.** HRS § 707–731(1)(b) provides in pertinent part that "[a] person commits the offense of sexual assault in the second degree if ... [t]he person knowingly subjects to sexual penetration another person who is mentally defective, mentally incapacitated, or physically helpless[.]"

**5.** The ICA's characterization of the Judicial Council of Hawai'i's Tentative Draft of the Penal Code, as legislative history, however, *see id.* at 454 n. 2, 918 P.2d at 261 n. 2, is inappropriate. The ICA cites the former as "legislative history" suggesting that "automatic penal liability as to any element of a sexual offense is to be frowned upon," notwithstanding the fact that the actual legislative history expressly demonstrates the legislative intent to impose automatic penal liability with respect to the age of the victim. *Id.* The Commentary to HRS § 702–235 (1993) (ineffective consent) is also cited and quoted, in part, as follows:

In Hawaii [Hawai'i] case law, cases of ineffective consent are found in relation to various sex offenses, where the consent of the female is deprived of effectiveness because of her immaturity; furthermore, liability with respect to the female's age is absolute. This section of the Code, as well as the definitions of sex offenses, changes this result.

*Id.* (brackets in original). HRS § 701–105 (1976) expressly provides that "[t]he commentary accompanying the Judicial Council of Hawaii's proposed draft of the Hawaii Penal code (1970), as revised, shall be published and may be used as an aid in understanding the provisions of this Code, *but not as evidence of legislative intent.*" (Emphasis added.) The Commentary to HRS § 702–235, therefore, to the extent that it suggests that the Code eliminates absolute liability with respect to the victim's age in a sex offense, is directly contrary to the unequivocally expressed legislative intent.

"knowing" state of mind to apply to the attendant circumstance of the victim's age—the legislature expressly deleted the language requiring knowledge.

The dissent finds fault with each step of the preceding analysis. It argues first that the language of HRS § 707–732(1)(b) is clear and unambiguous and that, therefore, the majority's attempt to discern the intent of the legislature from sources outside the plain language of the statute is in "disregard of our established rules of statutory construction." Concurring and Dissenting Opinion at 621. Second, the dissent contends that, having referred—impermissibly according to its first argument—to HRS § 702–207, the majority has misinterpreted that statute to authorize the court to look to the legislative history of HRS § 707–732(1)(b) to determine whether the legislature intended the specified state of mind to apply to less than all of the elements of the offense. *Id.* Third, the dissent asserts that the majority opinion erroneously "rel[ies] on the commentary on HRS § 702–207 in order to distill a legislative intent that is 'directly contrary to the unequivocally expressed' language of a substantive penal offense." *Id.* at 621. Finally, the dissent contends that our analysis "potentially renders all of the HPC's substantive provisions unconstitutionally vague." *Id.* at 621.

As previously noted, HRS § 707–732(1)(b) provides in pertinent part that "[a] person commits the offense of sexual assault in the third degree if . . . . [t]he person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person." The dissent's contention that "the language of HRS § 707–732(1)(b) is clear and unambiguous *on its face,*" Concurring and Dissenting Opinion at 618 (capital letters in original omitted) (emphasis added), is belied by the dissent's immediate resort to HRS §§ 707–700, 702–205, 701–114(1)(a) and (b), 702–204, 702–206(2), and, most significantly,

to HRS § 702–207, to distill the meaning of HRS § 707–732(1)(b). Concurring and Dissenting Opinion at 619–620. *See also State v. Wallace,* 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996) (referring to HRS § 702–207 to ascertain the requisite state of mind for each element of the substantive penal offense); *State v. Holbron,* 80 Hawai'i 27, 39, 904 P.2d 912, 924 (1995) (same); *State v. Kinnane,* 79 Hawai'i 46, 52–53, 897 P.2d 973, 979–80 (1995) (same); *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (same); *State v. Gaylord,* 78 Hawai'i 127, 136–37, 890 P.2d 1167, 1176–77 (1995) (same); *State v. Kupau,* 76 Hawai'i 387, 390, 879 P.2d 492, 495 (1994) (same).

The intent to require knowledge of the victim's age is not clear and unambiguous from the face of HRS § 707–732(1)(b);[6] indeed, like the intent to impose strict liability with respect to the victim's age, the intent to require knowledge is "completely invisible to the naked eye; that is, the 'ignorant' reader would have absolutely no way of discerning it solely on the basis of the plain, unambiguous, and obvious language of the statute." Concurring and Dissenting Opinion at 620. HRS § 707–732(1)(b) simply does not specify the requisite state of mind with respect to the attendant circumstances, which is precisely why the Judicial Council proposed, and the legislature adopted, HRS § 702–207—that is, to "resolve[ ] [this] *latent ambiguity* found in many penal statutes." Commentary to HRS § 702–207 (1993) (emphasis added). In its attempt to avoid Scylla, the dissent is thus drawn into Charybdis.[7] Certainly the dissent cannot be suggesting that the rules of statutory construction render HRS § 702–207 superfluous or insignificant; such an interpretation would, itself, violate a "cardinal rule of statutory construction." *See Methven-Abreu v. Hawaiian Insurance & Guaranty Co., Inc.,* 73 Haw. 385, 392, 834 P.2d 279, 284 (1992).

Presumably, then, it is the specific application of HRS § 702–207 in this case, rather

---

6. Presumably this is why the Judicial Council deemed it necessary, in its original draft, to include the language "whom [the actor] knows is less than [fourteen] years old." *See supra* majority opinion at 606–607.

7. Scylla is a headland on the Italian side of the Straits of Messina, opposite the whirlpool Charybdis. Homer personified Scylla and Charybdis as female sea monsters imperilling sailors attempting to navigate between them.

than its general applicability, to which the dissent objects. The dissent apparently contends that HRS § 702–207 does not authorize the court to look beyond the plain language of a statute defining a penal offense to determine whether an intent to apply the specified state of mind to less than all of the elements "plainly appears." Rather, according to the dissent, such purpose must "plainly appear *on the face of the statute.*" Concurring and Dissenting Opinion at 621 (quoting *Gaylord,* 78 Hawai'i at 137, 890 P.2d at 1177) (emphasis in original) (internal quotation marks omitted).

Notwithstanding the dicta in *Gaylord,* the plain language of HRS § 702–207 does not allow the interpretation urged by the dissent. HRS § 702–207 provides that

> When the definition of an offense specifies the state of mind sufficient for the commission of that offense, *without distinguishing among the elements thereof,* the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears.

*Id.* (emphasis added). It is virtually impossible to conceive of a criminal statute that, plainly, on its face, evinces an intent to apply the specified state of mind to less than all of the elements of the offense, without distinguishing among the elements of the offense. Neither *Gaylord* nor the dissenting opinion attempts to reconcile the proposed interpretation of HRS § 702–207—that any contrary purpose must plainly appear on the face of a statute—with its plain language.

Consulting the commentary to HRS § 702–207 as an aid to interpreting HRS § 702–207 and, more particularly, the phrase "unless a contrary purpose plainly appears" is entirely appropriate.[8] *See* HRS § 701–105 (1993) (Commentary "shall be published and may be used as an aid in understanding the provisions of this Code[.]"). The Commentary explains that the phrase "unless a contrary purpose plainly appears" does not mean that such a purpose must appear on the face of the statute, but, rather, that the purpose plainly appear in the legislative history of the statute. Commentary to HRS § 702–207 (1993).

The dissent's assertion that "the appellate courts of this state have *never* interpreted HRS § 702–207 to authorize them to look beyond the plain and unambiguous language of a statute—*i.e.,* to its legislative history— for the purpose of permitting a departure from the imperatives of HRS §§ 701– 114(1)(a) and (b), 702–204, 702–205, and 702– 206[,]" Concurring and Dissenting Opinion at 621 (emphasis in original), suggests that it is the result of the inquiry into legislative history, rather than the inquiry itself, to which the dissent objects. Indeed, in *In the Interest of John Doe,* the ICA also understood HRS § 702–207 to require an examination of the legislative history of the statute defining the offense, rather than a limited examination of the face of the statute, when determining whether "a contrary purpose plainly appears." 81 Hawai'i at 453–54, 918 P.2d at 260–61. Although its inquiry led to a different result, the ICA's analysis was identical to our own in the instant case.

Even assuming that the plain language of HRS § 707–732(1)(b) is unambiguous enough to render HRS § 702–207 superfluous, the dissent's selective application of the rules of statutory construction overlooks the purpose of those rules.

> Our primary duty in interpreting and applying statutes is to ascertain and give effect to the legislature's intention to the fullest degree. Although the intention of the legislature is to be obtained primarily from the language contained in the statute itself, we have rejected an approach to statutory construction which limits us to the words of the statute for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may ap-

---

8. The dissent's contention that our analysis relies on the commentary to distill the legislative intent is patently disingenuous. As the dissent observes elsewhere, the legislative intent is discerned from the conference committee report and contemporaneous committee reports, Concurring and Dissenting Opinion at 620–621, which, as the dissent also concedes, reflect that the legislature expressly amended the proposed language of the statute to delete the requirement of knowledge of the victim's age. *Id.* at 620.

pear on superficial examination. Thus, the plain language rule of construction does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 69, 868 P.2d 1193, 1215–16 (1994) (Klein, J., dissenting) (citations, internal quotation marks, and ellipsis omitted). Moreover, as the dissent acknowledges, " 'the strict construction rule does not permit the court to ignore legislative intent, nor require the court to reject that construction that best harmonizes with the design of the statute or the end sought to be achieved.' " Concurring and Dissenting Opinion at 618 n. 7 (quoting *Gaylord,* 78 Hawai'i at 138–39, 890 P.2d at 1178–79).

Nor does *State v. Meyer,* 61 Haw. 74, 595 P.2d 288 (1979), relied upon by the dissent, stand for the proposition that the rules of statutory construction may be used to thwart the unequivocally stated intent of the legislature when there is an interpretation of the statute that gives effect to that intent. In *Meyer,* the defendants, convicted of promoting a dangerous drug by distributing lysergic acid diethylamide, appealed, arguing that the applicable statute did not list lysergic acid diethylamide as a dangerous drug, but, instead, listed lysergic acid diethylamine as a dangerous drug. The court noted testimony that lysergic acid diethylamide and lysergic acid diethylamine were different substances, each with hallucinogenic properties, and inferred from the legislative history that the legislature intended to list lysergic acid diethylamide as a dangerous drug. *Id.* at 76, 595 P.2d at 291. It did not do so, however, and the court refused to change the language of the statute to achieve that result. Unlike in *Meyer,* the court, in this case, can ascertain and give effect to the intent of the legislature without changing the language of the statute.

■ Finally, the dissent's fear that the substantive provisions of the HPC—"a fragile organism that is subject to abuse and [that] requires vigilant protection,"—Concurring and Dissenting Opinion at 615–616 (footnote omitted), will potentially be rendered unconstitutionally vague as a result of the majority's analysis, *id.* at 621, is unfounded. The dissent's fear apparently stems from its misapprehension that, if a statute is not clear and unambiguous with respect to the requisite state of mind applicable to the attendant circumstances, the statute is unconstitutionally vague because it does not give the person of ordinary intelligence the opportunity to know what conduct is prohibited.

This court considered, and soundly rejected, an identical argument in *State v. Marley,* 54 Haw. 450, 509 P.2d 1095 (1973). In *Marley,* the defendants-appellants appealed their conviction for trespass, arguing, *inter alia,* that the statute was unconstitutionally vague because it failed to specify that "knowingly" entering the premises was an element of the offense. This court explained that:

> the failure of a statute to provide for knowledge as an element of a crime does not *ipso facto* render a statute unconstitutional. For not only are there statutory crimes without any requirement of intention or knowledge, but, as we noted in *State v. Taylor,* 49 Haw. 624, 636–37, 425 P.2d 1014, 1022 (1967), the applicable test for vagueness and overbreadth, which we adopted from *Boyce Motor Lines v. United States,* 342 U.S. 337, 340–1 [72 S.Ct. 329, 330–1, 96 L.Ed. 367] (1952), is not a checklist of requirements but is far more general. The test is that:
>
> > A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation.... Consequently, no more than a reasonable degree of certainty can be demanded. *Nor is it unfair to require that one who deliberately goes perilously close to an*

*area of proscribed conduct shall take the risk that he [or she] may cross the line.*

*Id.* at 460, 509 P.2d at 1103 (emphasis added) (footnote omitted).[9]

Certainly HRS § 707–732(1)(b) gives reasonable notice to the person of ordinary intelligence that sexual contact with children under fourteen years of age is prohibited and subjects the actor to criminal liability. Because the legislature apparently believed that children are "fragile organism[s] that [are] subject to abuse and require[ ] vigilant protection," it placed the risk of a mistake regarding the age of the child squarely on the adult "who deliberately goes periously close to an area of proscribed conduct."

Moreover, in rejecting knowledge of the age of the victim as an element of sexual assault in the third degree, the legislature was merely refusing to change the law as it existed before the enactment of the penal code. *See Silva,* 53 Haw. 232, 491 P.2d 1216. Strict liability with respect to the age of the victim in sexual assault offenses remains the rule, rather than the exception. *See* Charles E. Torcia, *3 Wharton's Criminal Law* § 285 at 71–71 n. 23 and cases cited therein (15th ed. 1995). As the Michigan Supreme Court explained in *People v. Cash,* 419 Mich. 230, 351 N.W.2d 822 (1984):

> It is well established that the Legislature may, pursuant to its police powers, define criminal offenses without requiring proof of a specific criminal intent and so provide that the perpetrator proceed at his [or her]

own peril regardless of his [or her] defense of ignorance or an honest mistake of fact. In the case of statutory rape, such legislation, in the nature of "strict liability" offenses, has been upheld as a matter of public policy because of the need to protect children[.]

*Id.* 351 N.W.2d at 826 (citations omitted).

To further its policy of protecting children from sexual exploitation by adults, the legislature expressly deleted knowledge of the child's age as an element of sexual assault offenses in which the child's age is an attendant circumstance. By doing so, it fairly placed on the adult the risk of mistake with respect to the child's age. Allocating that risk to the adult does not render HRS § 707–732(1)(b), let alone "the HPC's substantive provisions," unconstitutionally void for vagueness. The statute describes, with reasonable clarity, the act it proscribes and gives the person of ordinary intelligence a reasonable opportunity to know that sexual contact with persons under fourteen years of age is the prohibited conduct.[10]

### B. *Buch's Motion to Suppress*

■ Buch argues that the motion to suppress his statement [11] made to the police as a result of custodial interrogation was improperly denied because, "applying the common law tests[ ] to both defendant's testimony and the court's findings, defendant's statement to the police was involuntary[.]"

---

9. The *Marley* court further supported its conclusion with the observation that one of the trial court's instructions informed the jury that it must find that the defendants "intentionally remained upon the premises[.]" *Id.* The jury instructions, however, have no bearing on whether the statute itself is void for vagueness.

10. The dissent spuriously asserts that our construction of HRS § 707–732(1)(b) will generate absurd and unjust results, positing the example of two thirteen-year olds "making out," who would be class C felons if neither was aware of the other's age. Concurring and Dissenting Opinion at 625. The infirmity in the dissent's reasoning is readily apparent. It is not the imposition of strict liability with respect to the age of the victim that renders the result absurd and unjust; under the dissent's own interpretation, the children are still both felons if each has knowledge of the other's age. Under either the

dissent's interpretation or the majority's, HRS § 707–732(1)(b), zealously applied, criminalizes mutually consenting adolescent sexual experimentation; therein lies the absurdity.

The case before the court, however, involves sexual exploitation of an adolescent by an adult, the very conduct at which the statute is aimed.

11. Although Buch's statement was not a confession and was not inculpatory, "the prosecution may not use statements, *whether exculpatory or inculpatory,* stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *State v. Russo,* 67 Haw. 126, 132, 681 P.2d 553, 558 (1984) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)) (internal quotation marks omitted) (emphasis added).

"[O]ur review of whether [Buch's] statement was in fact coerced requires determination of whether the findings of the trial court are clearly erroneous." *State v. Villeza*, 72 Haw. 327, 331, 817 P.2d 1054, 1056 (1991). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *State v. Ganal*, 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996) (citations, internal quotation marks, and brackets omitted).

■ Moreover, "[a]ppellate review of whether a defendant's custodial statement to the police is the product of coercion requires us to 'examine the entire record and make an independent determination of the ultimate issue of voluntariness' based upon that review and 'the totality of circumstances surrounding the defendant's statement.'" *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (brackets omitted) (quoting *Villeza*, 72 Haw. at 330–31, 817 P.2d at 1056). However, "it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trial judge." *Domingo v. State*, 76 Hawai'i 237, 242, 873 P.2d 775, 780 (1994) (citation and internal quotation marks omitted).

■ At the hearing on the motion to suppress, Buch testified that, prior to signing HPD form 81 and giving his tape-recorded statement, Detective Mimaki threatened him with higher bail, loss of his paramedic license, and return to prison for a parole violation if Buch did not give a statement. Detective Mimaki denied making those threats. The circuit court, as trier of fact, implicitly found that Detective Mimaki's testimony was more credible. *See, e.g.,* FOF 15 and 18 (finding that "Detective Mimaki's conduct and practice during the interrogation was not egregious, his questions were not designed to illicit incorrect statements but to be truthful[,]" and that "Defendant understood his Constitutional Rights and Defendant did waive his rights voluntarily, knowingly, and intelligently."). As trier of fact at a motion to suppress hearing, it is the duty of

the trial court to judge the credibility of the witnesses and resolve factual conflicts in the testimony. *See State v. Patterson*, 58 Haw. 462, 468, 571 P.2d 745, 749 (1977). Apparently recognizing that an appellate court will not review the trial court's credibility determinations, Buch does not argue on appeal that he was threatened.

Nor does Buch challenge any of the circuit court's findings as clearly erroneous, but, rather, he argues that those findings support his contention that the statement was involuntary. Specifically, he cites the following FOF:

5. Defendant was asked about whether he was on any medication and he indicated he was for hypertension condition. Defendant also indicated that the medication did not impair his thinking or judgment in any[ ]way.

. . . .

9. Defendant has been arrested in the past and convicted.

10. Defendant has been subject to mental and physical abuse during his prior arrest and has filed complaints against 6 officers resulting in their suspension.

. . . .

16. Defendant appeared to be well aware of the criminal process. He is not a novice, not intimidated or overwhelmed by it. His prior experience of being beaten has not, in any[ ]way, affected his voluntariness in giving the statement.

Buch asserts that these findings demonstrate that "the defendant's statements were not voluntarily made due to the interaction of the social pressure exerted upon the defendant by the detective with the defendant's pre-existing physical, mental, and emotional conditions."

By "social pressure," Buch is apparently referring to Detective Mimaki's repeated comments, during the course of the interrogation, that "you're lying." Based on our examination of the entire record, including the tape recording of Buch's statement, it is our independent determination that these remarks were not accompanied by any threat, were made in a normal tone of voice, and, although phrased differently, are the func-

tional equivalent of the exhortations to tell the truth that this court approved of in *Kelekolio*. In that case, the court explained that exhortations to tell the truth, unaccompanied by threat or promise, do not render a subsequent confession involuntary because such exhortations

> are calculated to enhance, rather than diminish, the trustworthiness of an accused's inculpatory statement or confession. Accordingly, the proposition that a police investigator's unwillingness to accept a suspect's initial version of events at face value amounts to "coercion" *per se* is not only naive and disingenuous, but falls of its own weight; were we to accept it, the legitimate right of law enforcement agencies to seek voluntary confessions would be rendered nugatory.

74 Haw. at 505, 849 P.2d at 70 (citations omitted).

With respect to Buch's "pre-existing physical, mental, and emotional conditions," we have endorsed the general rule that, "in the absence of insanity or mental depletion, neither the voluntary character nor the admissibility of a confession is affected by the mental instability of the person making it." *Id.* at 503, 849 P.2d at 70 (quoting *State v. Kreps*, 4 Haw.App. 72, 77, 661 P.2d 711, 715 (1983)). The facts that Buch (1) was taking medication to control his hypertension and (2) had experienced prior physical abuse at the hands of police do not rise to the level of insanity or mental depletion.

Upon review of the entire record and considering the totality of the circumstances surrounding Buch's statement, it is our independent determination that Buch's statement was voluntarily and freely given. Buch's voice on the tape is calm, and he remained lucid throughout the interview. He indicated that, although he was taking medication for hypertension, the medication did not affect his thinking or judgment. He never indicated any desire to terminate the interview and never admitted to having committed the offense. In fact, he challenged Detective Mimaki to charge him and set bail so he could go to trial and be vindicated by a jury. Furthermore, the record indicates that Buch was not only well educated in general, but

particularly sophisticated with respect to the criminal process and his rights as an accused.

We, therefore, hold that Buch knowingly, intelligently, and voluntarily waived his rights to counsel and to remain silent and that he voluntarily gave his statement to the police. Consequently, the motion to suppress was properly denied.

### C. *Buch's Motion for Mental Examination of the Complaining Witness*

██ Buch's final argument is that the trial court erred in denying his motion for a mental examination of the complaining witness. We review the denial of Buch's motion for an abuse of discretion. *See State v. Vincent*, 51 Haw. 40, 450 P.2d 996 (1969); *State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973).

In *Vincent*, we "agree[d] with courts of other jurisdictions that a trial judge in his [or her] discretion may order a psychiatric examination of a witness on the question of credibility when a movant shows a compelling reason for such examination." *Id.* at 42, 450 P.2d at 998. We held, however, that "mere allegation by the appellants that the key witness had certain physical defects and that he was fabricating his story to get into the limelight was neither sufficient nor compelling ground for such examination." *Id.*

In *Kahinu*, the defendant was convicted of burglary in the first degree and assault with intent to rape. 53 Haw. at 537, 498 P.2d at 637. On appeal, he argued, *inter alia*, that the circuit court's refusal to order the complaining witness to submit to a psychiatric examination was an abuse of discretion because "such an examination becomes imperative in the absence of any evidence corroborating the complainant's testimony because in such circumstances the accused may fall victim to the groundless fantasies or vindictiveness of a pathological female." *Id.* at 545, 498 P.2d at 641. This court rejected the argument and held that "the circuit court properly exercised its discretion in denying the appellant's motion based upon nothing more compelling than a bald allegation that the complainant may be mentally ill." *Id.* at

547, 498 P.2d at 642–43. The *Kahinu* court, quoting with approval from *Ballard v. Superior Court of San Diego County,* 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838, 849 (1966), stated:

> We submit ... that a general rule requiring a psychiatric examination of complaining witnesses in every sex case or, as an alternative, in any such case that rests upon the uncorroborated testimony of the complaining witness would, in many instances, not be necessary or appropriate. Moreover, victims of sex crimes might be deterred by such an absolute requirement from disclosing such offenses.
>
> Rather than formulate a fixed rule in this matter we believe that discretion should repose in the trial judge to order a psychiatric examination of the complaining witness in a case involving a sex violation if the defendant presents a compelling reason for such an examination. [Citation omitted.]

*Id.* at 546–47, 498 P.2d at 642 (brackets and ellipses in original).

Buch argues that a subsequent California case, *People v. Russel,* 69 Cal.2d 187, 70 Cal.Rptr. 210, 443 P.2d 794 (1968), expanded the *Ballard* "compelling need" test by holding that a trial court's discretion to order a mental examination of a complaining witness "is liberally exercised for defendants in sex abuse cases." This argument, however, is specious. The issue in *Russel* was the admissibility of a psychiatrist's testimony based on his court ordered examination of the complaining witness. The court expressly stated that, "[i]n the instant case, however, we are not concerned with the propriety of psychiatric *examination* [.]" *Id.* 70 Cal.Rptr. at 215, 443 P.2d at 799 (emphasis in original). *See also id.* 70 Cal.Rptr. at 217, 443 P.2d at 801 ("that order [for a mental examination of the complaining witness], *the propriety of which is not here questioned* .... Although the order is not now under attack and does not

require our reappraisal, ..." (Emphasis added.)).[12]

In this case, Buch asserts that he "is raising the issue of the effect of the victim's mental and/or emotional condition upon his or her credibility based on his claim that the victim is a homosexual and that the victim's accusation was part of an attempt to gain money from the defendant." Thus, Buch maintains there was a compelling reason for the mental examination of the complaining witness. These claims are even less compelling than the "bald allegations" of physical defects or mental illness that the court held were insufficient to warrant court-ordered examinations in *Vincent* and *Kahinu* because, even if true, neither homosexuality nor desire for money would affect the witness's credibility in ways the jury would not be able to detect without the aid of psychiatric knowledge. We hold, therefore, that the denial of Buch's motion to compel a psychiatric examination of the complaining witness was not an abuse of discretion.

### III. *CONCLUSION*

Based on the foregoing discussion, we affirm Buch's conviction, judgment, and sentence for sexual assault in the third degree.

LEVINSON, Justice, concurring and dissenting, in which KLEIN, Justice, joins.

I fully agree with the majority's holdings, for the reasons stated therein, that: (1) "Buch knowingly, intelligently, and voluntarily waived his rights to counsel and to remain silent and that he voluntarily gave his statement to the police," majority opinion at section II.B.; and (2) "the [circuit court's] denial of Buch's motion to compel a psychiatric examination of the complaining witness was not an abuse of discretion," *id.* at section II.C.

I also agree with the majority's holding that sexual assault in the fourth degree as

---

**12.** Not only has *Ballard* *not* been judicially expanded, it has been legislatively overruled. Section 1112 was added to the California Penal Code in 1980 and provides:

Notwithstanding the provisions of subdivision (d) of Section 28 of Article I of the California Constitution, the trial court shall not order any

prosecuting witness, complaining witness, or any other witness, or victim in any sexual assault prosecution to submit to a psychiatric or psychological examination for the purpose of assessing his or her credibility.

West's Ann.Cal.Penal Code § 1112 (1984).

defined by Hawai'i Revised Statutes (HRS) § 707–733(1)(a) (1993) is not included in sexual assault in the third degree as defined by HRS § 707–732(1)(b) (1993), within the meaning of HRS § 701–109(4) (1993). *See* majority opinion at section II.A.1. I do so because: (1) the former is not "established by proof of the same or less than all the facts required to establish the commission of" the latter, *see* HRS § 701–109(4)(a); (2) the injury sufficient to establish the commission of the former is not "less serious" than that sufficient to establish the commission of the latter, but, rather, is the same, *see* HRS § 701–109(4)(c); and (3) the former does not entail "a different state of mind indicating [a] lesser degree of culpability" than the latter, *see id.*

However, notwithstanding that the relevant "legislative history," as reflected in the committee reports cited by the majority, indicates the legislature's belief that the sexual offense laws, as codified in the Hawai'i Penal Code (HPC), establish that "where the age of the victim is an element of a sexual offense, the specified state of mind [was] not ... to apply to that element," majority opinion at section II.A.2., the legislature's failure to effectuate its belief impels me respectfully to disagree with the majority that

> a defendant is strictly liable with respect to the attendant circumstance of the vic-

tim's age in a sexual assault and that, consequently, Buch's testimony that the victim appeared to be between fourteen and sixteen years of age is not a rational basis in the evidence for a verdict acquitting him of sexual assault in the third degree. . . .

*Id.*[1] In my view, this result is not only mistaken, but also undermines the integrity of the conceptual approach to criminal liability incorporated in the HPC. Because the HPC is a fragile organism that is subject to abuse and requires vigilant protection,[2] I have no choice but to address some of the implications of the court's decision in this matter.

I. *PURSUANT TO THE RULES OF STATUTORY CONSTRUCTION TO WHICH THIS COURT ADHERES, WE MAY LOOK BEYOND THE PLAIN, OBVIOUS, AND UNAMBIGUOUS LANGUAGE OF A SUBSTANTIVE PROVISION—THE CONSTITUTIONALITY OF WHICH IS NOT AT ISSUE—OF THE HPC, ONLY IF A LITERAL CONSTRUCTION OF THAT LANGUAGE WOULD PRODUCE AN ABSURD AND UNJUST RESULT.*

I begin my analysis with some rules of statutory construction to which this court has

---

**1.** It is somewhat ironic—not to mention unfortunate—that the majority reaches the issue at all. Insofar as sexual assault in the fourth degree in violation of HRS § 707–733(1)(a), with respect to which Buch sought a jury instruction, is not included in sexual assault in the third degree in violation of HRS § 707–732(1)(b), for reasons wholly extraneous to the requisite state of mind regarding the "attendant circumstance" of the age of the complaining witness in this case, *see* HRS § 701–109(4)(a) and (c), it would have been error for the circuit court to have given an included offense instruction, despite Buch's request for one. *Cf. State v. Holbron*, 80 Hawai'i 27, 45, 904 P.2d 912, 930 (holding, *inter alia*, that circuit court erred in giving jury instruction regarding a nonexistent offense that it mistakenly believed was included in charged offense), *reconsideration denied*, 80 Hawai'i 187, 907 P.2d 773 (1995). Moreover, because Buch was not charged with sexual assault in the fourth degree, he could not have been convicted of it under any circumstances.

**2.** On July 1, 1993, the Hawai'i legislature declared:

> The [HPC] is the fundamental document by which the State addresses crime. It is imperative that so important a body of law receive full and deliberate attention from time to time, to assure its continued force and effectiveness.
> . . . .
> During the [last] ten years ..., numerous amendments have been made to the [HPC] on a piecemeal basis. However, there has not been comprehensive review as to the effect these amendments have on the principles and philosophy on which the [HPC] is based. Moreover there are concerns as to the structural and systemic impact these amendments have on the entire criminal justice system. . . . Accordingly, the legislature has determined that the time has arrived for a ... review to take place and that this review should not only be concerned with periodic changes that have been made to the original 1972 [HPC], but also with the concept that the [HPC] is not an isolated body of law but rather a part of the entire criminal justice system of the State.
>
> 1993 Haw. Sess. L. Act 284, § 1 at 525. *See infra* note 11.

consistently adhered. First, "the fundamental starting point for statutory interpretation is the language of the statute itself." *Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996) (citation and quotation signals omitted); *State v. Kwak*, 80 Hawai'i 291, 295, 909 P.2d 1106, 1110 [hereinafter, *Kwak I* ] (citation and quotation marks omitted), *vacated in part on other grounds on reconsideration, State v. Kwak*, 80 Hawai'i 297, 909 P.2d 1112 (1995) [*Kwak II* ]; *State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995) (citations, internal quotation marks, and brackets omitted); *Housing Fin. and Dev. Corp. v. Castle*, 79 Hawai'i 64, 76–77, 898 P.2d 576, 588–89 (1995) (citation, quotation marks, brackets, and ellipsis points omitted); *Schmidt v. Board of Directors of Ass'n of Apartment Owners of The Marco Polo Apartments*, 73 Haw. 526, 531, 836 P.2d 479, 482 (1992) (citation and brackets omitted); *State v. Eline*, 70 Haw. 597, 601, 778 P.2d 716, 719 (1989) (citation and quotation marks omitted).

Second, "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Kwak I*, 80 Hawai'i at 295, 909 P.2d at 1110 (citation and quotation marks omitted); *see also Mathewson*, 82 Hawai'i at 71, 919 P.2d at 983 (citation and quotation signals omitted); *Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 67, 905 P.2d 29, 42 (1995) (quoting *State v. Ramela*, 77 Hawai'i 394, 395, 885 P.2d 1135, 1136 (1994)); *Toyomura*, 80 Hawai'i at 18, 904 P.2d at 903 (citation and internal quotation marks omitted); *Castle*, 79 Hawai'i at 77, 898 P.2d at 589 (citation and quotation marks omitted); *Lealaimatafao v. Woodward–Clyde Consultants*, 75 Haw. 544, 551, 867 P.2d 220, 224 (1994) (citation omitted).

Third, implicit in the task of statutory construction is "our foremost obligation[, namely,] to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Mathewson*, 82

Hawai'i at 71, 919 P.2d at 983 (citation and quotation signals omitted); *Kwak I*, 80 Hawai'i at 295, 909 P.2d at 1110 (citations and internal quotation marks omitted); *Norton v. Administrative Director of Court, State of Hawai'i*, 80 Hawai'i 197, 201, 908 P.2d 545, 549 (1995) (quoting *Ramela*, 77 Hawai'i at 395, 885 P.2d at 1136); *Cieri*, 80 Hawai'i at 67, 905 P.2d at 42 (quoting *Crosby v. State Dep't of Budget & Fin.*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995)); *Toyomura*, 80 Hawai'i at 18, 904 P.2d at 903 (quoting *Crosby* ); *Castle*, 79 Hawai'i at 77, 898 P.2d at 589 (citation and quotation marks omitted); *State v. Aluli*, 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995) (citation omitted); *State v. Ortiz*, 74 Haw. 343, 351, 845 P.2d 547, 551, *reconsideration denied*, 74 Haw. 650, 849 P.2d 81 (1993) (citation omitted).

It is at this point that the canons of statutory construction begin to take on the quality of *Aesop's Fables*, " 'pulling in opposite directions' " and " 'no more enabl[ing] difficult questions of interpretation to be answered than the maxims of everyday life enable the difficult problems of everyday living to be solved.' " *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 55 n. 14, 868 P.2d 1193, 1202 n. 14 (quoting R. Posner, *The Problems of Jurisprudence* 280 (1990)), *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994).

For example, in *State v. Meyer*, 61 Haw. 74, 595 P.2d 288 (1979), despite a clear and unambiguous legislative history—as reflected in the relevant committee reports—of an intent to accomplish a particular result in amending the drug laws, this court held, by virtue of the plain language of its statutory work product, that "the [l]egislature did not carry its intention into effect." *Id.* at 76, 595 P.2d at 290. Accordingly, the *Meyer* court quoted *Queen v. San Tana*, 9 Haw. 106, 108 (1893), which it analogized to HRS § 701–104 (1976),[3] for the following "principle of con-

---

**3.** HRS § 701–104 (1993), which has never been amended, provides:

> **Principles of construction.** The provisions of this Code cannot be extended by analogy so as to create crimes not provided for herein;

however, in order to promote justice and effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of the words, taken in their usual sense, in connection with the context,

struction" that, in its view, remained "sound":

> We cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. We do not legislate or make laws. *Even where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used.*

*Meyer*, 61 Haw. at 77–78, 595 P.2d at 291 (emphasis added).

Thus, substantially in the tradition of *Meyer*, this court has frequently reaffirmed the proposition that, for purposes of gleaning the intent of the legislature, " 'where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.' " *Mathewson*, 82 Hawai'i at 71, 919 P.2d at 983 (citation and quotation signals omitted); *Norton*, 80 Hawai'i at 201, 908 P.2d at 549 (quoting *Ramela*, 77 Hawai'i at 395, 885 P.2d at 1136); *State v. Baron*, 80 Hawai'i 107, 113, 905 P.2d 613, 619 (quoting *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995)), *reconsideration granted in part and denied in part*, 80 Hawai'i 187, 907 P.2d 773 (1995); *see also Aluli*, 78 Hawai'i at 320, 893 P.2d at 171 (citations omitted).[4]

The body of case law flowing from *Meyer* would seem to suggest that this court is unwilling to dig for the intent of the legislature beyond the language of its enactments, assuming, of course, that the statutory language at issue is plain, obvious, and unambiguous. Indeed, one might assume—naively—that any further search would, by its very nature, be anathema to this court's fundamental tenets of statutory construction. Such is not the case. As it happens, this court hedges its bets.

Stated most obliquely, this court subscribes to the "well settled" rule that

"where there is no ambiguity in the language of a statute, *and the literal application of the language would not produce an absurd or unjust result* [5], clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the statute must be given effect according to its plain and obvious meaning."

*Sandy Beach Defense Fund v. City Council of the City and County of Honolulu*, 70 Haw. 361, 369, 773 P.2d 250, 256 (1989) (quoting *State v. Palama*, 62 Haw. 159, 161, 612 P.2d 1168, 1170 (1980)) (emphasis added). Thus, "[t]his court derives legislative intent primarily from the language of [the] statute and follows the general rule that[,] in the absence of clear legislative intent to the contrary, the plain meaning of the statute will be given effect." *State v. Akina*, 73 Haw. 75, 78, 828 P.2d 269, 271 (1992) (citation omitted). Similarly, "departure from the plain and unambiguous language of the statute cannot be justified without a clear showing that the legislature intended some other meaning would be given the language." *In re Tax Appeal of Lower Mapunapuna Tenants Ass'n*, 73 Haw. 63, 68, 828 P.2d 263, 266 (1992) (citation and quotation marks omitted).

Stated more directly, "even absent statutory ambiguity, departure from literal construction is justified *when such construction would produce an absurd and unjust result* and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act." *Franks v. City and County of Honolulu*, 74 Haw. 328, 341, 843 P.2d 668, 674 (1993) (quoting *Hawaiian Ins. & Guar. Co. v. Financial Sec. Ins. Co.*, 72 Haw. 80, 807 P.2d 1256 (1991)) (emphasis added).

*Sandy Beach Defense Fund* and *Franks* teach that this court is, indeed, willing to look beyond the plain, obvious, and unambiguous language of a statute, the facial constitutionality of which is not at issue, for the purpose

---

and with reference to the purpose of the provision.

4. I submit that section II.A.2. of the majority opinion fails completely to address the plain and obvious meaning of HRS § 707–732(1)(b).

5. HRS § 1–15(3) (1993) provides that "[e]very [statutory] construction which leads to an absurdity shall be rejected."

of ascertaining its underlying legislative intent, but *only* if a literal construction of the statute "would produce an absurd and unjust result." [6] I submit that this court has never, under the banner of legislative intent, "rewritten" the clear and unambiguous language of a substantive offense proscribed by the HPC when a literal construction of the statute has not otherwise produced an absurd and unjust result and the statute, as literally construed, generates no constitutional infirmity.[7] If I am correct, then the questions become (1) whether the language of HRS § 707–732(1)(b) is clear and unambiguous as written, and, if so, (2) whether a literal construction of the statute produces an absurd and unjust result. If the answer to the first question is "yes" and the answer to the second is "no," then I respectfully suggest that, in accordance with *Meyer, supra,* the legislature simply "did not carry its intention into effect" regarding strict liability where the victim's age is an element of a sexual offense (in this case, sexual assault in the third degree, as defined by HRS § 707–732(1)(b)),

and we lack the "authority to depart from the plain meaning of the language used."

## II. *THE LANGUAGE OF HRS § 707– 732(1)(b) IS CLEAR AND UNAM- BIGUOUS ON ITS FACE.*

The HPC proscribes the offense of sexual assault in the third degree in HRS § 707– 732, which provides in relevant part:

**Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:

(a) The person recklessly subjects another person to an act of sexual penetration by compulsion;

(b) *The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person;*

(c) The person knowingly subjects to sexual contact another person who is mentally defective, mentally incapacitated, or physically helpless, or causes

---

**6.** Section II.A.2. of the majority opinion nowhere considers whether a literal construction of HRS § 707–732(1)(b) would produce an absurd and unjust result.

**7.** This court has long recognized that, although "[i]t is elementary that a criminal statute be construed strictly ..., where the [statutory] language is plain and unambiguous, there is no occasion for construction," *State v. Good Guys For Fasi,* 56 Haw. 88, 91, 528 P.2d 811, 813 (1974) (citations omitted), "strict" or otherwise. *State v. Lee,* 55 Haw. 505, 513, 523 P.2d 315, 319 (1974). Absent plain and unambiguous language, however, "we have consistently adhered in this jurisdiction to the rule of strict construction of penal statutes." *State v. Smith,* 59 Haw. 456, 461, 583 P.2d 337, 341 (1978) (citations omitted); *see also* HRS § 701–104. Thus, "the general rule of construction [is] that ambiguous penal statutes are to be construed in favor of the accused." *Aluli,* 78 Hawai'i at 321, 893 P.2d at 172 (citation omitted).

When choice has to be made between two readings of what conduct the legislature has made a crime, it is appropriate, before we choose the harsher alternative, to require that the legislature should have spoken in language that is clear and definite.... [Thus, when] [i]t is virtually self-evident that the drafters of the [HPC] could easily have spoken in clearer and more definite terms ... [a]nd when language reasonably susceptible of two constructions is used in a penal law[,] ordinarily that construc-

tion which is more favorable to the offender will be adopted.

*State v. Rodgers,* 68 Haw. 438, 443–44, 718 P.2d 275, 277–78, *reconsideration denied,* 68 Haw. 688 (1986) (citations and quotation marks omitted) (some brackets added and some omitted) (some ellipsis points added and some omitted).

By the same token, we have also recognized that "the strict construction rule does not permit the court to ignore legislative intent, nor require the court to reject that construction that best harmonizes with the design of the statute or the end sought to be achieved." *State v. Gaylord,* 78 Hawai'i 127, 138–39, 890 P.2d 1167, 1178–79 (1995) (citation and quotation marks omitted); *Ortiz,* 74 Haw. at 352, 845 P.2d at 552 (citations omitted). *See also State v. Burgo,* 71 Haw. 198, 202, 787 P.2d 221, 223 (1990); *State v. Kanoa,* 67 Haw. 476, 477, 691 P.2d 1169, 1171, *reconsideration denied,* 67 Haw. 684, 744 P.2d 779 (1984); *State v. Murray,* 63 Haw. 12, 18, 621 P.2d 334, 339 (1980); *Smith,* 59 Haw. at 461, 583 P.2d at 341–42; *State v. Ogata,* 58 Haw. 514, 517, 572 P.2d 1222, 1224 (1977). In each of these cases, however, the foregoing proposition either (1) redounded to the defendant's benefit (*Ortiz, Kanoa,* and *Murray*) and/or (2) was invoked to (a) resolve a constitutional challenge of the statute in question (*Gaylord*), (b) reconcile facial ambiguity in the statutory language (*Murray, Smith,* and *Ogata*), (c) avoid an absurd result (*Burgo* and *Ogata*), or (d) some combination of these purposes.

such a person to have sexual contact with the actor;

(d) The person, while employed in a state correctional facility, knowingly subjects to sexual contact an imprisoned person or causes such person to have sexual contact with the actor; [or]

(e) The person knowingly, by strong compulsion, has sexual contact with another person or causes another person to have sexual contact with the actor[.] . . .

(2) Sexual assault in the third degree is a class C felony.

HRS § 707–732 (1993) (emphasis added). Buch, of course, was charged and convicted under subsection (1)(b) of the statute.

HRS § 707–700 (1993) defines the terms material to sexual offenses in general and sexual assault in the third degree in particular. "Person" means "a human being who has been born and is alive." *Id.* (Although seemingly innocuous, the definition of "person" is significant, in light of the majority's holding regarding strict liability, because sexual assault in the third degree, within the meaning of HRS § 707–732(1)(b), may be committed either by a male or a female, irrespective of age and in the complete absence of lack of consent. This fact can, and will, lead to some truly bizarre anomalies. *See infra* at section III.) "Sexual contact" means "any touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts." *Id.*

Pursuant to HRS § 702–205 (1993), the "elements of an offense" are defined as such conduct, attendant circumstances, and results of conduct as are (1) specified by the statuto-

ry definition of the offense and (2) negative a defense on the merits (*i.e.*, a defense "other than one based on the statute of limitations, lack of venue, or lack of jurisdiction"). *See* commentary on HRS § 702–205. Thus, the "elements" of sexual assault in the third degree, as defined by HRS § 707–732(1)(b), include the potentially mutual "conduct" of "sexual contact," as well as the "attendant circumstances" that (1) the participants in the "sexual contact" are not married to each other and (2) the object of the "sexual contact" is "less than fourteen years old."[8] Similarly, every other variant of sexual assault in the third degree, as proscribed by HRS § 707–732(1) is composed of its own combination of "conduct," "attendant circumstances," and (in some instances) "results of conduct."[9]

Within the framework of the HPC,

HRS § 701–114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense. Moreover, HRS § 702–204 (1993) provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense." . . . HRS § 702–207 (1993) provides that "[when] the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears." In addition, pursuant to HRS § 702–205 . . . , the requisite state of mind applies to such conduct, attendant circumstances, and results of conduct as are specified by the definition of the offense.

*State v. Wallace,* 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996) (quoting *State v. Hol-*

---

8. Of course, *both* objects of the "sexual contact" could easily be "less than fourteen years old." *See infra* at section III.

9. For example, I note that HRS § 707–700 defines "compulsion" to mean "absence of consent, or a threat, express or implied, that places a person in fear of public humiliation, property damage, or financial loss." The issuance of a

threat is clearly "conduct." *See* HRS § 701–118(4) (1993). On the other hand, "absence of consent" is an "attendant circumstance," and the state of being placed in fear is a "result of conduct." Thus, "compulsion" may be "conduct," an "attendant circumstance," a "result of conduct," or a combination thereof.

*bron,* 80 Hawai'i 27, 39, 904 P.2d 912, 924, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995)) (some ellipsis points in original and some added) (brackets in original).

The parameters of the "knowing" state of mind applicable to HRS § 707–732(1)(b) are delineated in HRS § 702–206(2) (1993), entitled "Definitions of states of mind," as follows:

(2) "Knowingly."

(a) A person acts knowingly with respect to [the person's] conduct when [the person] is aware that [the person's] conduct is of that nature.

(b) A person acts knowingly with respect to attendant circumstances when [the person] is aware that such circumstances exist.

(c) A person acts knowingly with respect to a result of [the person's] conduct when [the person] is aware that it is practically certain that [the person's] conduct will cause such a result.

If I read its opinion correctly, the majority concedes that the foregoing analytical framework applies to every form of sexual assault in the third degree proscribed by HRS § 707–732(1), *except* with respect to the attendant circumstance of the "victim's" age in the context of HRS § 707–732(1)(b), claiming that "the legislature expressly deleted the language requiring knowledge" in that regard. *See* Majority opinion at section II.A.2. (While I do not dispute that the legislative committee reports cited in section II.A.2. of the majority opinion say what they say, the majority does not, and cannot, deny that the legislature prescribed "knowingly" as the requisite state of mind in connection with HRS § 707–732(1)(b).) For example, the majority takes no issue with the holding of the Intermediate Court of Appeals (ICA) in *In re John Doe, Born on September 5, 1977,* 81 Hawai'i 447, 918 P.2d 254 (1996), that a defendant could not be found guilty of the offense [of second degree sexual assault of a mentally defective person, in violation of HRS § 707–731(1)(b) (1993)— which is a more serious analogue of HRS § 707–732(1)(c)—] unless the State proved beyond a reasonable doubt that the complaining witness was mentally defective

*and the defendant was aware that the complaining witness was mentally defective.*

81 Hawai'i at 448–49, 918 P.2d at 255–56 (emphasis added). Neither does the majority suggest that there is any patent ambiguity in the language of HRS § 707–732(1)(b) as enacted. That being the case, if—as the majority maintains—HRS § 702–207 imposes strict liability with respect to an element of HRS § 707–732(1)(b), such strict liability is completely invisible to the naked eye; that is, the "ignorant" reader would have absolutely no way of discerning it solely on the basis of the plain, unambiguous, and obvious language of the statute.

As indicated above, a person commits the offense of sexual assault in the third degree, in violation of HRS § 707–732(1)(b), if the person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person.

Accordingly, the language of HRS § 707–732(1)(b) being clear and unambiguous, I maintain that there were five material elements of the offense of sexual assault in the third degree as charged in the indictment against Buch, each of which the prosecution was required to prove beyond a reasonable doubt in order to establish guilt. These five material elements were: (1) that Buch subjected the complaining witness to sexual contact (*i.e.,* the prohibited conduct, to wit, placing his hand on the complaining witness' penis); (2) that Buch was aware that he was doing so (*i.e.,* the requisite knowing state of mind with respect to the actor's conduct, *see* HRS § 702–206(2)(a)); (3) that Buch was aware that the complaining witness was not married to him (*i.e.,* the requisite knowing state of mind with respect to the attendant circumstance implicit in "sexual contact," *see* HRS § 702–206(2)(b)); (4) that the complaining witness was less than fourteen years old at the time of the sexual contact (*i.e.,* the attendant circumstance of the complaining witness' age, *see* HRS § 702–205); and (5) that Buch was aware that the complaining witness was less than fourteen years old at the time (*i.e.,* the requisite knowing state of

mind with respect to attendant circumstances, *see* HRS § 702–206(2)(b)).

The majority's sole authority for the deletion of the fifth element is the commentary on HRS § 702–207, which, in the majority's view, "makes clear" that

> [t]he phrase "unless a contrary purpose plainly appears" is intended to allow the courts to avoid an improper result when the language of a statute fails to indicate that the specified state of mind applies to less than all elements *and legislative history indicates that this was intended.*

Commentary on HRS § 702–207 (emphasis added). Relying on the commentary, the majority then looks to Conf. Comm. Rep. No. 1, in 1972 House Journal, at 1038 (and contemporaneous committee reports) for its conclusion that—the clear and unambiguous language of HRS § 707–732(1)(b) to the contrary notwithstanding—"[t]he legislative history unequivocally indicates that, where age of the victim is an element of a sexual offense, the specified state of mind is not intended to apply to that element." Majority opinion at section II.A.2.

Aside from its disregard of our established rules of statutory construction, there are at least three deficiencies in the majority's reliance on the commentary on HRS § 702–207 to facilitate its redrafting of HRS § 707–732(1)(b). First, as far as I can determine, the appellate courts of this state have *never* interpreted HRS § 702–207 to authorize them to look beyond the plain and unambiguous language of a statute—*i.e.*, to its legislative history—for the purpose of permitting a departure from the imperatives of HRS §§ 701–114(1)(a) and (b), 702–204, 702–205, and 702–206. In fact, the obverse is the case. In *State v. Gaylord*, 78 Hawai'i 127, 890 P.2d 1167 (1995), this court expressly relied on HRS § 702–207 in ruling that "intent" was the requisite state of mind for each of the elements of a theft offense, inasmuch as "no contrary purpose 'plainly appears' *on the face of the statute.*" *Id.* at 137, 890 P.2d at 1177 (emphasis added).

Second, as footnote five of the majority opinion takes pains to remind the ICA, "HRS § 701–105 [ (1993) ] expressly provides that '[t]he commentary accompanying [the HPC]

... may be used as an aid in understanding the provisions of this Code, *but not as evidence of legislative intent.'* " (Emphasis in original.) That being the case, it is inconsistent, at the very least, for the majority to rely on the commentary on HRS § 702–207 in order to distill a legislative intent that is "directly contrary to the unequivocally expressed" language of a substantive penal offense. *See* majority opinion at 607 n. 5.

The third and by far the most profoundly troubling aspect of the manner in which the majority utilizes HRS § 702–207 to redraft HRS § 707–732(1)(b) is that it potentially renders all of the HPC's substantive provisions unconstitutionally vague. Specifically, the majority cites a number of this court's recent decisions—all of which resort to the clear and unambiguous "preliminary provisions" of the HPC set forth in HRS ch. 701 and the clear and unambiguous "general principles of penal liability" set forth in HRS ch. 702 in order to discern the clear and unambiguous meaning of various substantive offenses contained within the HPC, which is precisely why HRS chs. 701 and 702 are included in the HPC—in support of its claim that "[t]he dissent's contention that 'the language of HRS § 707–732(1)(b) is clear and unambiguous *on its face*,' ... is belied by the dissent's immediate resort to HRS §§ 707–700, 702–205, 701–114(1)(a) and (b), 702–204, 702–206(2), and most significantly, to HRS § 702–207, to distill the meaning of HRS § 707–732(1)(b)." Majority opinion at 608 (emphasis in original). Having scored what it apparently regards as a direct hit, the majority then proclaims:

> The intent to require knowledge of the victim's age is not clear and unambiguous from the face of HRS § 707–732(1)(b); indeed, like the intent to impose strict liability with respect to the victim's age, *the intent to require knowledge is "completely invisible to the naked eye; that is, the 'ignorant' reader would have absolutely no way of discerning it solely on the basis of the plain, unambiguous, and obvious language of the statute."* Concurring and Dissenting Opinion at 14. *HRS § 707–732(1)(b) simply does not specify the req-*

*uisite state of mind with respect to the attendant circumstances . . . .*

Majority opinion at 608 (footnote omitted) (emphases added).

I believe, by virtue of the foregoing statements, that the majority unwittingly makes my point.

> Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudging guilt, or the statute is void for vagueness. *State v. Kameenui,* 69 Haw. 620, 621, 753 P.2d 1250, 1251 (1988). Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.

*State v. Gaylord,* 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (quoting *State v. Tripp,* 71 Haw. 479, 482, 795 P.2d 280, 282 (1990)). What the majority fails to perceive is that it is precisely the HPC's preliminary provisions and general principles of penal liability (*i.e.,* HRS §§ 701–114(a) and (b), 702–204, 702–205 and 702–207) that make it possible—without resorting to extrinsic sources—for the HPC's substantive penal statutes to "state with reasonable clarity the act[s they] proscribe and provide fixed standards for adjudging guilt" and for "the person of ordinary intelligence" to have "a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct."

Indeed, but for the HPC's preliminary provisions and general principles of penal liability, this court, not to mention "the person of ordinary intelligence," would *always* be forced to consult sources extrinsic to the HPC itself "to know what conduct is prohibited." That is the quintessence of vagueness. That is also what is so mistaken about the majority's belief that HRS § 707–732(1)(b) "is not clear and unambiguous" on its face with respect to the requisite state of mind as to the elements of the proscribed offense. If the majority is correct, then *every* substantive provision of the HPC encompassing at-

tendant circumstances, *see* HRS § 702–205 (as well as results of conduct, *see id.*), is likewise "not clear and unambiguous" on its face.

By way of example, and to illustrate my argument, let us extend the majority's logic with respect to another sexual offense. A person commits a form of sexual assault in the second degree if "[t]he person knowingly subjects another person to an act of sexual penetration by compulsion[.]" HRS § 707–731(1)(a) (1993).[10] In accordance with HRS § 702–205, the elements of one variation of HRS § 707–731(1)(a) include conduct (*i.e.,* subjecting another person to a sexual act, in this instance, penetration), an attendant circumstance (*i.e.,* compulsion, as manifested by "absence of consent," *see supra* note 9), and a result of conduct (*i.e.,* the state of being penetrated). I maintain that, pursuant to HRS §§ 702–204, 702–205, 702–207, and 701–114(1)(b), the burden is clearly and unambiguously placed on the prosecution to prove the requisite state of mind (in this case, knowledge, *see* HRS § 702–206(2)) with respect to the proscribed conduct, *attendant circumstance,* and result of conduct. After all, the unadorned conduct of subjecting another person to an act of sexual penetration is not proscribed by the HPC.

According to the majority, however, I am merely indulging in an unwarranted and foolish assumption, because a clear and unambiguous legislative intent to require proof beyond a reasonable doubt of knowledge with respect to the attendant circumstance of "absence of consent" can *never* be ascertained without combing the Senate and House Journals to insure that there is no indication of a legislative intent to impose strict liability. How, then, is a person of ordinary intelligence, who reasonably believes that his or her partner is "willing," or even "eager," to know whether, under the law, he or she is engaging in the ultimate physical intimacy at peril of committing a class B felony? Must he or she do research? If so, what if the legislative journals are not part of the person's library? What if the person visits the

---

**10.** "Sexual penetration" is defined in HRS § 707–700 and includes, *inter alia,* "vaginal in-    tercourse."

law library and overlooks an ancient and long-forgotten legislative committee report? What if the person neglects to consult his or her attorney on the subject? What if the person's attorney does not comb the Senate and House Journals, but "merely" relies on the ostensibly reckless belief that HRS § 707–732(1)(a) means what it says? And so on. Applying the foregoing construct to the entire HPC, as the majority must necessarily do, leaves this state's criminal law in chaos.

*State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973), which is taken out of context at 610–611 of the majority opinion, fails utterly to rebut the foregoing analysis. In *Marley*, the defendants were convicted of criminal trespass, a petty misdemeanor, in violation of HRS § 771–1, a *pre-HPC* statute that provided in relevant part that

> [w]hoever, without right, enters or remains in or upon the dwellinghouse, buildings, or improved or cultivated lands of another or the land of another about or near any buildings used for dwelling purposes, after having been forbidden to do so by the person who has lawful control of such premises, either directly or by notice posted thereon ... shall be fined not more than $250, or imprisoned not more than three months, or both....

54 Haw. at 454 n. 1, 509 P.2d at 1099–1100 n. 1 (emphases deleted). On appeal, the defendants challenged the statute, *inter alia*, on the grounds that it was unconstitutionally vague insofar as it did not impose "knowledge" as the requisite state of mind and—presumably—was therefore defined as a strict liability offense. *Id.* at 459, 509 P.2d at 1102. This court rejected the defendants' contention, primarily on the bases that "the failure of a statute to provide for knowledge as an element of a crime does not *ipso facto* render a statute unconstitutional" and that, in any event, "the trial court actually recognized a knowledge element in the crime of trespass." *Id.* at 459–60, 509 P.2d at 1103.

The relevance of this pre-HPC decision eludes me. What *is* relevant are the trespass offenses delineated in the HPC at HRS §§ 708–813 through –815 (1993), which proscribe variations of the same conduct addressed by the predecessor statute at issue

in *Marley*. I defy the majority to demonstrate—in the face of HRS §§ 701–114(a) and (b), 702–204, 702–205, and 702–207—that the requisite states of mind enumerated in the post-HPC trespass offenses do not apply to each and every element of those offenses.

*People v. Cash*, 419 Mich. 230, 351 N.W.2d 822 (1984), cited at 611 of the majority opinion, is equally inapposite. Obviously, within constitutional limits, "the [l]egislature may, pursuant to its police powers, define criminal offenses without requiring proof of a specific criminal intent and so provide that the perpetrator proceed at his own peril regardless of his defense of ignorance or an honest mistake of fact." *Id.* 351 N.W.2d at 826. The fact is, however, that the Hawai'i legislature has not. *See* section III. of this opinion, *infra*. The majority's protestations to the contrary are not self-validating.

The bottom line is that, "[e]ven where [this] [c]ourt is convinced in its own mind that the [l]egislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used." *Meyer*, 61 Haw. at 77, 595 P.2d at 291.

### III. *THE CLEAR AND UNAMBIGUOUS LANGUAGE OF HRS § 707–732(1)(b) DOES NOT PRODUCE AN ABSURD AND UNJUST RESULT.*

My premise in this section is that there is nothing absurd or unjust about the clear and unambiguous language of HRS § 707–732(1)(b), insofar as it requires—as a prerequisite to criminal culpability—that a defendant act "knowingly" with respect to the "attendant circumstance" of the victim's age. Indeed, I would think the proposition uncontroversial in the extreme, being merely one application of the principles of penal liability permeating the entire HPC, much less the sexual offenses that are only one part of it.

With particular reference to the issue of strict liability in the context of the age of the victim of a sexual assault, I fully subscribe to the views expressed by the late Justice Levinson, dissenting in *State v. Silva*, 53 Haw.

232, 235–44, 491 P.2d 1216, 1217–23 (1971), with which I am probably more intimately familiar than any other living person. I will not undertake to regurgitate the entirety of the analysis contained in that opinion, although I do believe that it is a virtual primer on the quintessence of criminal culpability. The following, however, bears repetition here:

The common law principle that it is not conduct alone but conduct accompanied by certain specific mental states which concerns, or should concern the law is, to say the least, primordial. A mistaken belief in facts which if they did exist would render an act innocent, negates the requisite *mens rea* (the state of mind required to establish an element of the offense) and constitutes a defense in criminal prosecutions. This court has recognized the rule allowing a defense to a crime considered *malum in se* because of a mistake of fact subject to the qualification that the mistake must not be due to the negligence or carelessness of the defendant.[11]

. . . .

. . . [J]udicially constructed strict liability in mid-twentieth century criminal law is an anachronism; it stands as the major bar to rational solution of important social problems.

. . . .

I agree that it is time to substitute knowledge of sex offenses for emotional fixations and to reform the rules in light of sound principles of penal liability. The judicially construed strict liability which the courts have given the law of mistake, we are free to take away.

*Silva*, 53 Haw. at 235–36, 238, 244, 491 P.2d at 1218, 1220, 1223 (Levinson, J., dissenting) (citations, quotation marks, and ellipsis points omitted) (some brackets added and some omitted).

In promulgating the HPC, the legislature abolished the very "judicially construed strict liability" that Justice Levinson decried.

Need for revising Hawaii's penal law is self evident. The existing criminal statutes find their origin, for the most part, in the Penal Code of 1869. . . . The organization of Hawaii's penal laws defies rational explanation. . . .

By way of contrast, the proposed [HPC] is subject to a unique organizational princip[le]. The first six chapters of the [HPC] present the general part of the

---

11. It is worth mentioning that the December 28, 1994 Final Report of the Committee to Conduct a Comprehensive Review of the Hawai'i Penal Code, mandated by 1993 Haw. Sess. L. Act 284, § 2 at 525–26, recommended, *inter alia*, that the legislature amend HRS § 707–732(1)(b) to provide:

**Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:

. . . .

(b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person; *provided that it is an affirmative defense that the defendant reasonably believed that the other person was fourteen years of age or older*[.]

Final Report at 131 (amending language emphasized). The comment accompanying the proposed legislation provides in relevant part:

The 1984–85 penal code revision project proposed strict liability for the "statutory rape" subsections, 707–730(1)(b) and 707–732(1)(b), but the Legislature rejected these proposals. The committee concedes that strict liability is an excessively harsh culpability criterion, but at the same time believes that the current statutes, requiring proof of knowledge and awareness that youthful victims are indeed under fourteen, are insufficiently protective of young children. To accommodate these apparently conflicting principles, the committee settled on an objective standard of culpability: It is an "affirmative defense," which according to [HRS] § 701–115(2)(b) [ (1993) ] must be proved by the defense by the preponderance of the evidence, "that the defendant reasonably believed that the other person was fourteen years of age or older." The defendant must prove not only his or her honest belief that the partner was fourteen, but also that that belief was a reasonable one under the circumstances. This is negligence, and although negligence ordinarily will not justify criminal liability (negligent homicide and a few other ch. 707 offenses being exceptions), the need to protect children from sexual predation may very well, in the committee's judgment, warrant such a strict standard here. In any event, requiring a defendant to establish that his claimed belief would have been shared by reasonable persons does not seem unduly burdensome.

*Id.* at 133. To date, as was true with respect to the recommendation of its predecessor committee, the legislature has not acted on the committee's recommendation.

penal law: those principles and rules which have or may have application regardless of the specific type of offense involved. . . .

. . . .

2.  Chapter [702] establishes the general principles of penal liability; the criminal law is concerned both with a man's state of mind at the time of the crime as well as his conduct. *This chapter codifies the generally accepted principle that penal liability must be based on voluntary action coupled with a culpable state of mind.* Here the [HPC] would eliminate the wide diversity of words and phrases used to denote or connote a state of mind sufficient to impose penal liability, limiting the provisions of the law to four states of mind: intentional, knowing, reckless and negligent.

Stand. Comm. Rep. No. 227, in 1971 House Journal, at 784–85. I repeat my suggestion that there is nothing absurd or unjust about the foregoing approach, which, as discussed above, is now super-imposed on the entire HPC by HRS §§ 702–204, 702–205, 702–206, and 702–207.

In fact, the majority's construction of HRS § 707–732(1)(b), zealously applied, could generate results that no one would deny are not only unjust, but also absurd to the point of lunacy. I posit two extreme cases to illustrate my point. Assume two eighth graders, one a boy and the other a girl, both of whom are thirteen years of age but who reasonably believe the other to be fourteen. While "making out" after school, they knowingly engage in "sexual contact." An indignant teacher learns of the behavior and refers the children to the family court as potential "law violators," within the meaning of HRS ch. 571 (1993 & Supp.1995). According to the majority's view, the children are "class C felons," having *both* violated HRS § 707–732(1)(b).

Consider a more egregious hypothetical: Assume that the same two children "go all the way" one evening in a public park. A disapproving police officer happens upon them *in flagrante delicto* and makes a chapter 571 referral to the family court. As the majority would have it, the children are "class A felons," having *both* violated HRS § 707–730(1)(b) (1993).

It is apparent, at least to me, that it is the majority's construction of HRS § 707–732(1)(b) that is unjust, absurd, and transforms the HPC into "a rope of sand which perishes in the twisting[.]" R. Emerson, "Politics," *Essays: Second Series* (1844), *reprinted in Complete Works of Ralph Waldo Emerson* 3:199 (1903), *reprinted in* F. Shapiro, *The Oxford Dictionary of American Legal Quotations* 294 (1993).

## IV.  *CONCLUSION*

Because "the [l]egislature did not carry its intention into effect," *Meyer,* 61 Haw. at 76, 595 P.2d at 290, I would hold, in accordance with HRS §§ 701–114(1)(a) and (b), 702–204, 702–205, 702–206, and 702–207, that the "knowing" state of mind prescribed by HRS § 707–732(1)(b) applies to the "attendant circumstance" of the "victim's" age.